IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
ANDERSON/GREENWOOD DIVISION

Estate of Jose R. Riopedre, by and through )    Case No. 8:12-cv-02806-BHH-JDA
Fernando Mendez; and Susana Mendez,   )
                                       )
      Plaintiffs,               )    **REPORT AND RECOMMENDATION**
                                       )        **OF MAGISTRATE JUDGE**
        v.                    )
                                         )
United States of America, et al.[1]     )
                                         )
      Defendants.            )
_____ )

This matter is before the Court on a motion for summary judgment filed by Defendants. [Doc. 88.] Jose Riopedre ("Riopedre") was a federal prisoner, and his estate and his wife ("Plaintiffs") bring this civil rights action under *Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics*, 403 U.S. 388 (1971), also alleging a claim for loss of consortium, love, companionship, and familial association and a claim for wrongful death under the Federal Torts Claim Act ("FTCA"), 28 U.S.C. §§ 2671–2680. [Doc. 40.] Pursuant to the provisions of 28 U.S.C. § 636(b)(1)(B) and Local Civil Rule 73.02(B)(2)(d), D.S.C., the undersigned is authorized to review all pretrial matters in cases regarding prison conditions and to submit findings and recommendations to the District Court.

Plaintiffs filed this action on September 26, 2012, against the United States and other individuals who work at the Estill Federal Corrections Institution ("Estill"). [Doc. 1.] Plaintiffs amended their Complaint on October 19, 2012, October 30, 2012, and February

---

[1] Plaintiffs have dismissed Anita Cano, Jeremy Dallas, Clarence Wiggins, Michael Hill, Tracy Horvath, Scott Williams, Vernon Robinson and Tamala Middleton from this action. [Doc. 92 at 1; Doc. 109.] The remaining defendants include the United States, Mildred Rivera, Robert Binford, James Sovik, Chris Orr, Raganold Williams, Richella Lawson, Richard Wallace, Tracy Horvath, Scott Williams, Paul Sneed, Gregory Bondurant, John Enzinna, Dr. Derick Phillips, Stephen Buckler, Pam Weathers, and Christopher Bush.

14, 2013.[2]  [Docs. 11, 24, 40.]  Plaintiffs seek damages for violations of Riopedre's constitutional rights under the First, Fifth, Eighth, and Fourteenth Amendments to the United States Constitution; the loss of companionship, mental pain and anguish, and loss of Riopedre's earning potential by his spouse; and the wrongful death of Riopedre.  [Doc. 40.]   More specifically, Plaintiffs allege that Defendants demonstrated deliberate indifference by failing to recognize Riopedre's known psychological issues and worsening condition that led to his suicide under their care [*id.* ¶¶ 114–17]; by placing Riopedre in a Special Housing Unit ("SHU") for no justifiable reason despite his known clinical depression, failing to provide an appropriate level of surveillance or to give proper notifications about his deteriorating condition and weight loss, allowing him to collect items ultimately used to kill himself, and failing to notice or take action over suicidal behavior [*id.* ¶¶ 118–19]; and by failing to provide Riopedre with immediate first aid resuscitative measures and/or emergency medical care [*id.* ¶¶ 123–24].   Plaintiffs further allege that Defendants breached their duty of care and as a result of Riopedre's death, his wife, Susana Mendez ("Mendez"), faces hardship and injury due to her loss of companionship, mental pain and anguish, and loss of Riopedre's earning potential.  [*Id.* ¶¶ 137–42.]  Finally, Plaintiffs allege that Defendant the United States of America was negligent in its provision of emergency medical treatment to Riopedre, resulting in his wrongful death.  [*Id.* ¶¶ 156–57.]

On November 27, 2013, Defendants filed a motion for summary judgment.  [Doc. 88.]  Plaintiffs filed a response in opposition and supportive documentation on January 6,

---

[2] All references to the Complaint will be to the Third Amended Complaint, which is the operative complaint before the Court. [Doc. 40.]

2

2014 [Doc. 92], and Defendants replied on January 16, 2014 [Doc. 97]. The Court ordered additional briefing from Plaintiffs on the FTCA claim on June 6, 2014 [Doc. 99], which Plaintiffs filed on June 11, 2014 [Doc. 101]. Defendants were given an opportunity to respond but were not required to do so, and the time for responding has expired. Therefore, the motion for summary judgment is now ripe for review.

## BACKGROUND

On July 23, 2009, Riopedre pleaded guilty to conspiracy to distribute a Schedule IV controlled substance and was sentenced by the District of Maryland to a term of imprisonment of twelve months and one day. [Doc. 88-1 at 4–5.] The court recommended that Riopedre participate in a mental health evaluation and treatment program and be designated to a facility in or around South Florida. [*Id.*] Riopedre was also sentenced to a year of supervised release after his discharge from prison and required to forfeit $1.5 million. [*Id.* at 5–9.] He was ordered to self-report to the Bureau of Prisons ("BOP") on September 11, 2009, and was due to be released on July 21, 2010. [*Id.* at 10–11.] Riopedre was designated to Estill in South Carolina, a decision made by staff at the BOP's Designation and Sentence Computation Center in Grand Prairie, Texas, and not by any Defendants in this action. [*See, e.g.*, Doc. 88-3 ¶ 3.]

Riopedre self-surrendered at Estill on September 9, 2009. [Doc. 81-1 at 38.] He was designated as fit for general population. [*Id.*] Riopedre underwent a psychological services inmate intake interview that same day, in which he reported that he used sleeping pills, that he had anxiety, but that he did not desire psychological services. [*Id.* at 41.] In his medical intake, Riopedre "verbalized" that he had "some depression . . . a few years

3

ago with medication by outside psychologist." [*Id*. at 43.] He was referred to the psychology department "due to history of Depression on street." [*Id*. at 45.] The medical evaluation noted that Riopedre had been on medication for his depression, "which he stopped by himself." [*Id*. at 48.]

During his psychological evaluation on September 10, 2010, Riopedre reported that he had taken Paxil for depression from 2006 through 2009. [*Id*. at 49.] He denied that he had ever attempted suicide. [*Id*.] The evaluator noted that Riopedre did not indicate interest in participating in mental health treatment and his "psychological stability for custody [was] judged to be favorable." [*Id*.] He was informed of the mental health services available to him, but the evaluation found the "need for clinical intervention absent at present." [*Id*. at 50.] The report detailed that Riopedre "voluntarily discontinued his rx Paxil and sleep medication in 2009, just prior to entering FBOP custody as he did not want to serve his sentence while taking medication." [*Id*.] He did not indicate a threat to himself or others and was advised to contact Estill's mental health services "as needed." [*Id*. at 50–51.]

On September 11, 2009, two days after reporting to Estill, Riopedre was moved from the general population to SHU.[3] Prison officials testified that Riopedre's Unit Team determined that he should be moved to SHU pending reclassification because he "needed to be separated from another inmate who was at the Satellite Camp." [Doc. 88-3 ¶ 7.] Inmates in SHU receive routine visits from mental health services. [Doc. 88-5 ¶ 14.] The

_____

[3] The Code of Federal Regulations defines SHUs as "housing units in Bureau institutions where inmates are securely separated from the general inmate population, and may be housed either alone or with other inmates. Special housing units help ensure the safety, security and orderly operation of correctional facilities, and protect the public, by providing alternative housing assignments for inmates removed from the general population." 28 C.F.R. § 541.21.

4

BOP recognizes that inmates in SHUs may experience psychological distress because of the restrictions in the units, so all inmates so confined for more than 30 days must be seen by mental health professionals. [*Id*. ¶ 26.] At Estill, the policy was to see the SHU inmates every fourteen days. [*Id*. ¶ 27.]

Riopedre was seen by the staff psychologist on September 16, 2009, September 30, 2009, October 14, 2009, and October 28, 2009. [*Id*.] Robert Binford ("Binford"), one of Estill's clinical psychologists, testified that during these routine visits, he "observed that [Riopedre's] mental health functioning was within normal limits. This meant I observed an absence of psychopathology, and that he was not any type of suicidal risk." [*Id*.] Binford averred that he did not recall observing that Riopedre had lost a significant amount of weight. [*Id*. ¶ 16.] Binford stated that he interviewed Riopedre for the last time on October 28, 2009, and that Riopedre did not display any suicidal ideations at the time. [*Id*. ¶ 17.] Riopedre was never placed on suicide watch, which is required under BOP Program Statement 5324.08 if an inmate exhibits "significant potential for suicide." [*Id*. ¶ 30.] Binford testified that in his medical opinion, Riopedre did not exhibit such potential, and that the alleged weight loss and discontinuation of Paxil would be insufficient to raise an automatic red flag for suicide. [*Id*. ¶¶ 32–34.] He stated further that Riopedre was asked repeatedly if Riopedre wanted to resume taking Paxil and Riopedre refused; additionally, Riopedre did not exhibit any of the warning signs for suicide as a result of Paxil withdrawal.[4] [*Id*.]

---

[4] The warning label on Paxil states:

>    All patients being treated with antidepressants for any indication should be monitored appropriately and observed closely for clinical worsening, suicidality, and unusual changes in behavior, especially during the initial few months of a course of drug therapy, or at times of dose

In contrast, Mendez testified that Riopedre was "exhibiting clear signs of depression both in his phone calls and written correspondence." [Doc. 92-21 ¶ 2.] In a recorded phone call between the spouses, Riopedre told Mendez that he was "destroyed, if you'd see me, you wouldn't recognize me." [Doc. 92-25 at 1.] Riopedre lost 32 pounds during his six weeks in SHU. [Docs. 92-23 at 1; 92-19 at 2.] Moreover, Mendez averred that Riopedre did not speak English well; thus, the staff at Estill was unable to properly communicate with him. [Doc. 92-21 ¶ 4.] Finally, she claimed that Estill staff would not allow the family to see Riopedre when they drove up from Miami to visit. [*Id*. ¶ 6.] Due to her concern over Riopedre's placement in SHU and its impact on him, Mendez requested that Riopedre's defense attorney, Ana Davide ("Davide"), reach out to the prison to find out why Riopedre had been placed in SHU. [Doc. 88-2 at 119.] Davide did so on October 2, 2009. [*Id*.] On October 7, 2009, the BOP responded that "some security issues concerning Mr. Riopedre being housed at the SCP was brought to the attention of staff" but that Riopedre was not placed in SHU for any disciplinary infraction and that his transfer to another prison was pending. [*Id*. at 121.] Mendez also asked her Congressional Representative, Lincoln Diaz-Balart, to reach out to the BOP to rectify Riopedre's placement in SHU, which the Congressman did on October 20, 2009. [Doc. 88-2.]

---

changes, either increases or decreases.

Further, there is a warning for discontinuation of Paxil, which reads

[D]uring marketing of Paxil and other SSRIs and SNRIs, there have been spontaneous reports of adverse events occurring upon the discontinuation of these drugs (particularly when abrupt), including the following–dysphoric mood, irritability, agitation, dizziness, sensory disturbances, anxiety confusion, headache, lethargy, emotional liability, insomnia, and hypomania. Patients should be monitored for these symptoms when discontinuing treatment with Paxil. A graduation reduction in the dose rather than abrupt cessation is recommended whenever possible.

[Doc. 88-5 ¶ 33.]

On the morning of October 31, 2009, Riopedre committed suicide by wrapping socks around his neck.  [Doc. 81-1 at 120.]  He was pronounced dead at the local hospital at 7:45 a.m.  [*Id.*]  Reports vary as to the timeline of events the morning of October 31, 2009.  Internal memoranda written the day of the event indicate that Riopedre's cell mate made a distress call at 6:18 a.m. or 6:20 a.m. and shouted to staff that "[my] celly needs help!"  [Doc. 88-2 at 173–176 (four separate Estill employees noted that the distress call came in between 6:18 and 6:20 a.m.).]  There is no dispute that medical personnel were not called until 6:48 a.m.[5]  [Doc. 88-2 at 177.]  Defendant Raganold Williams, one of the correctional officers in SHU on the day of Riopedre's death, testified that the clocks in the SHU are often not consistent and he wrote down 6:18 a.m. in his log based on his memory of looking at the clock, but it could have in fact been later.  [Doc. 88-16 ¶ 12.]  He stated further,

> I cannot explain how the Control Center came to the conclusion that the call for assistance was performed at approximately 6:48 a.m.  From the time that we heard inmate Castro yelling for help, to the time we realized it was him yelling from his cell, to the time Mr. Riopedre was observed slumped against the cell wall, only 1-2 minutes had elapsed. As soon as staff saw Mr. Riopedre, the Control Center was called for assistance.  Then, as I previously stated, the Operations Lieutenant and a Medical staff member were on the scene within [sic] very quickly.

[*Id.*]  After the emergency call went out at 6:48 a.m., Nurse Tamala Middleton responded and found Riopedre on the floor of his cell with a noose around his neck.  [Doc. 88-2 at

---

[5] The suicide reconstruction performed by the BOP makes no reference to the discrepancy in timing, let alone trys to explain the potential thirty-minute delay.  [*See* Doc. 92-19.]  Moreover, the report raises questions for the Court such as to why the officers would not have been able to see Riopedre in the cell, as they reported in the reconstruction, if such cells were set up as a special housing unit for maximum supervision.  [*See id.*]

181.] He was not responsive, and Middleton told the officers to call an amublance. [*Id.*] She began CPR and instructed the officers to obtain the defibrillator. [*Id.*] EMS then arrived and transported Riopedre to the hospital, where he was pronounced dead. [*Id.*]

## APPLICABLE LAW

**Requirements for a Cause of Action Under *Bivens***

In *Bivens*, the Supreme Court established a direct cause of action under the Constitution of the United States against federal officials for the violation of *federal* constitutional rights. 403 U.S. at 389. A *Bivens* claim is analogous to a claim under 42 U.S.C. § 1983[6]; federal officials cannot be sued under § 1983, however, because they do not act under color of *state* law. *Harlow v. Fitzgerald*, 457 U.S. 800, 814–20 (1982). Case law involving § 1983 claims is applicable in *Bivens* actions and vice versa. *See Farmer v. Brennan*, 511 U.S. 825 (1994); *Mitchell v. Forsyth*, 511 U.S. 511, 530 (1985); *Turner v. Dammon*, 848 F.2d 440, 443–44 (4th Cir. 1988). To establish a claim under *Bivens*, a plaintiff must prove two elements: (1) the defendant deprived the plaintiff of a right secured by the Constitution and laws of the United States and (2) the defendant did so under color of federal law. *See Mentavlos v. Anderson*, 249 F.3d 301, 310 (4th Cir. 2001) (citation and internal quotation marks omitted) (setting forth requirements for a § 1983 claim under color of state law); *see also Bivens*, 403 U.S. at 389 ("In [a previous case], we reserved the question whether violation of [the Constitution] by a federal agent acting under color of his authority gives rise to a cause of action for damages consequent upon his unconstitutional conduct. Today we hold that it does.").

---

[6]Section 1983 provides a private cause of action for plaintiffs alleging constitutional violations by persons acting under color of state law.

**Summary Judgment Standard**

Rule 56 of the Federal Rules of Civil Procedure states, as to a party who has moved for summary judgment:

> The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.

Fed. R. Civ. P. 56(a).  A fact is "material" if proof of its existence or non-existence would affect disposition of the case under applicable law.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  An issue of material fact is "genuine" if the evidence offered is such that a reasonable jury might return a verdict for the non-movant.  *Id.* at 257.  When determining whether a genuine issue has been raised, the court must construe all inferences and ambiguities against the movant and in favor of the non-moving party.  *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962).

The party seeking summary judgment shoulders the initial burden of demonstrating to the court that there is no genuine issue of material fact.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  Once the movant has made this threshold demonstration, the non-moving party, to survive the motion for summary judgment, may not rest on the allegations averred in his pleadings.  *Id.* at 324.  Rather, the non-moving party must demonstrate specific, material facts exist that give rise to a genuine issue.  *Id.*  Under this standard, the existence of a mere scintilla of evidence in support of the non-movant's position is insufficient to withstand the summary judgment motion.  *Anderson*, 477 U.S. at 252.  Likewise, conclusory allegations or denials, without more, are insufficient to preclude granting the summary judgment motion.  *Ross v. Commc'ns Satellite Corp.*, 759 F.2d 355,

365 (4th Cir. 1985), *overruled on other grounds*, 490 U.S. 228 (1989).  "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment.  Factual disputes that are irrelevant or unnecessary will not be counted."  *Anderson*, 477 U.S. at 248.  Further, Rule 56 provides in pertinent part:

> A party asserting that a fact cannot be or is genuinely disputed must support the assertion by:
>
> > (A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or
> >
> > (B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.

Fed. R. Civ. P. 56(c)(1).  Accordingly, when Rule 56(c) has shifted the burden of proof to the non-movant, he must produce existence of a factual dispute on every element essential to his action that he bears the burden of adducing at a trial on the merits.

## DISCUSSION

*Bivens* Claim[7]

As stated, Plaintiffs allege that Defendants violated Riopedre's First,[8] Fifth,[9] Eighth,

---

[7] The Court notes *Bivens* claims for damages are not actionable against the United States, federal agencies, or public officials acting in their official capacities. *See FDIC v. Meyer*, 510 U.S. 471, 486 (1994) (declining to extend a *Bivens* remedy to federal agencies); *see also Doe v. Chao*, 306 F.3d 170, 184 (4th Cir. 2002) (noting "a *Bivens* action does not lie against either agencies or officials in their official capacity"). However, sovereign immunity does not bar damages actions against federal officials in their individual capacities for violation of an individual's constitutional rights. *Gilbert v. Da Grossa*, 756 F.2d 1455, 1459 (9th Cir. 1985) (citing *Davis v. Passman*, 442 U.S. 228 (1979)). Further, sovereign immunity is not a bar to actions seeking equitable relief. *Singletary v. Fallen*, No. 0:11-543-CMC-PJG, 2012 WL 368375, at *2–3 (D.S.C. Jan. 17, 2012) (discussing relevant case and statutory law), *report and recommendation adopted by* 2012 WL 368364 (D.S.C. Feb. 3, 2012). Accordingly, to the extent Plaintiffs assert claims for damages against Defendants in their official capacities, those claims should be dismissed, but the Court will consider Plaintiffs' claims to the extent they have asserted such claims against Defendants in their individual capacities.

[8] The Court is unclear as to what exactly Plaintiffs allege was a violation of Riopedre's First Amendment rights. However, to the extent Plaintiffs allege that Riopedre's First Amendment rights were violated when he was not allowed to visit his family, this claim must fail. There is "no constitutional right to prison visitation, either for prisoners or visitors." *White v. Keller*, 438 F.Supp. 110, 114–15 (D. Md.1977), *aff'd* 588 F.2d 913 (4th Cir. 1978). Accordingly, it is recommended that Defendants' motion for summary judgment be granted with respect to Plaintiffs' claim for violation of Riopedre's First Amendment rights.

[9] The Fifth Amendment to the United States Constitution prohibits the taking of one's liberty without due process. A prisoner's liberty interest protected by the Due Process Clause is "generally limited to freedom from restraint which . . . imposes atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." *Sandin v. Conner*, 515 U.S. 472, 484 (1995) (internal citations omitted). Although *Sandin* involved a state prisoner alleging a violation of his constitutional rights under the Due Process Clause of the Fourteenth Amendment, courts have extended its application to Fifth Amendment due process claims challenging confinement in federal prisons. *See, e.g., Ware v. Morrison*, 276 F.3d 385, 387 (8th Cir. 2002); *Crowder v. True*, 74 F.3d 812, 814 (7th Cir. 1996). Although not entirely clear that Plaintiffs are bringing a separate claim of violation of Riopedre's Fifth Amendment rights, as opposed to his Eighth Amendment rights, for his placement in SHU, to the extent Plaintiffs assert this claim, they have failed to establish Riopedre had a liberty interest in being in the general population. To the contrary, the Supreme Court has observed that administrative segregation "is the sort of confinement that inmates should reasonably anticipate receiving at some point in their incarceration." *Hewitt v. Helms*, 459 U.S. 460, 468 (1983) (reviewing prison regulations authorizing administrative segregation "to protect the prisoner's safety, to protect other inmates from a particular prisoner, [or] to break up potentially disruptive groups of inmates"), *receded from by Sandin*, 515 U.S. at 483–84 & n. 5. Accordingly, the Fourth Circuit has held that "confinement to administrative segregation [does not] exceed[] the sentence imposed in such an extreme way as to give rise to the protection of the Due Process Clause by its own force." *Beverati v. Smith*, 120 F.3d 500, 502 (4th Cir. 1997). Therefore, courts must consider whether confinement in administrative segregation constitutes such an "atypical hardship" when compared to regular prison life as to give rise to a liberty interest in avoiding it. *Id.*

In *Beverati*, the court noted that the applicable prison regulations led to the conclusion that confinement in administrative segregation did not implicate a liberty interest. *Id.* at 503–04 (listing cases). However, the plaintiffs in *Beverati* submitted affidavits indicating that the actual conditions in administrative segregation were more onerous than those specified in the prison regulations. *Id.* at 504. Even so, the court found that the prisoners' six-month confinement in administrative segregation did not constitute an "atypical

and Fourteenth[10] Amendment rights.  Specifically, Plaintiffs allege that Defendants[11] acted

---

and significant hardship" necessary to confer a liberty interest upon them despite allegations that the prisoners were afforded no outside recreation and no educational or religious services and the cells were invested with vermin, smeared with human feces, flooded with water from a broken toilet, and considerably hotter than cells in the general population.  *Id.*

Here, Defendants argue that Plaintiffs do not have a liberty interest in avoiding administrative segregation because it does not constitute an atypical hardship when compared to ordinary prison life. Plaintiffs have failed to present any evidence that the actual conditions were more onerous than those in *Bevarati*; accordingly, Defendants' motion for summary judgment should be granted with respect to Plaintiffs' claim for violation of Riopedre's Fifth Amendment rights.

[10] The Fourteenth Amendment applies only to states and state actors.  *District of Columbia v. Carter*, 409 U.S. 418, 424 (1973) ("[A]ctions of the Federal Government and its officers are beyond the purview of the [Fourteenth] Amendment.").  Consequently, Defendants' motion for summary judgment should be granted with respect to Plaintiffs' claim for violation of Riopedre's Fourteenth Amendment rights.

[11]To the extent Plaintiffs have alleged a claim against Defendants Rivera and Bondurant under a theory of supervisory liability, such claim should be denied.  First,  the Supreme Court may have entirely abrogated supervisory liability in *Bivens* actions.  *See Iqbal*, 556 U.S. at 693 (Souter, J., dissenting) ("Lest there be any mistake, . . . the majority is not narrowing the scope of supervisory liability; it is eliminating *Bivens* supervisory liability entirely.  The nature of a supervisory liability theory is that the supervisor may be liable, under certain conditions, for the wrongdoing of his subordinates, and it is this very principle that the majority rejects.").  Moreover, even if supervisory liability remains in *Bivens* actions, because there is no doctrine of respondeat superior in *Bivens* and § 1983 claims, *id.* at 676–84, a defendant is liable in his individual capacity only for his personal wrongdoing or supervisory actions that violated constitutional norms, *see Shaw v. Stroud*, 13 F.3d 791, 799 (4th Cir. 1994) (setting forth elements necessary to establish supervisory liability under § 1983).  A plaintiff must establish three elements to prevail under § 1983 on a theory of supervisory liability:

> (1) that the supervisor had actual or constructive knowledge that his subordinate was engaged in conduct that posed "a pervasive and unreasonable risk" of constitutional injury to citizens like the plaintiff; (2) that the supervisor's response to that knowledge was so inadequate as to show "deliberate indifference to or tacit authorization of the alleged offensive practices[]"; and (3) that there was an "affirmative causal link" between the supervisor's inaction and the particular constitutional injury suffered by the plaintiff.

*Id.* (citations omitted).  Here, Warden Rivera was responsible for the general oversight of the prison but did not make decisions on the daily activities or classifications of inmates.  [Doc. 88-3 ¶ 1.]  She averred that she had no personal knowledge of Riopedre's background or mental health issues, nor did she participate in the decision to house Riopedre in the SHU.  [*Id.* ¶ 7.]  She was not at the institution when Riopedre committed suicide.  [*Id.* ¶ 11.]  Similarly, Captain Bondurant oversaw security for the entire institution and was not involved in the intake screening performed on Riopedre, the decision to place him in SHU or his mental health issues.  [Doc. 88-4 ¶¶ 4–6, 13.]  The only argument Plaintiffs make as to these Defendants' supervisory liability is that Riopedre's confinement in SHU was approved by Defendants Sneed and Wiggins and then reviewed by Bondurant and Rivera.  [Doc. 92 at 25.]  Plaintiffs point to no facts to substantiate this claim, and even if they did, such a claim is insufficient to demonstrate that Bondurant and Rivera had actual or constructive knowledge that their subordinates were engaged in conduct that posed a "pervasive and unreasonable risk" for injury to Riopedre's constitutional rights.

with deliberate indifference with regard to Riopedre's designation and classification to SHU and to his medical and mental health needs, which Plaintiffs allege led to Riopedre's suicide.  [Doc. 40 at 24–28.]

Deliberate indifference to a prisoner's serious medical needs violates the Eighth Amendment and states a cause of action under *Bivens* because deliberate indifference constitutes "the 'unnecessary and wanton infliction of pain.'"  *Estelle*, 429 U.S. at 104–05 (quoting *Gregg v. Georgia*, 428 U.S. 153, 173 (1976) (joint opinion of Stewart, Powell, and Stevens, JJ.)).  Deliberate indifference exists when prison officials know of a substantial risk to a prisoner's health or safety and consciously disregard that risk.  *See Farmer v. Brennan*, 511 U.S. 825, 836 (1994); *Miltier v. Beorn*, 896 F.2d 848, 851–52 (4th Cir. 1990) ("Deliberate indifference may be demonstrated by either actual intent or reckless disregard. A defendant acts recklessly by disregarding a substantial risk of danger that is either known to the defendant or which would be apparent to a reasonable person in the defendant's position." (citation omitted)).  Within the United States Court of Appeals for the Fourth Circuit, "the treatment must be so grossly incompetent, inadequate, or excessive as to shock the conscience or to be intolerable to fundamental fairness" to violate a prisoner's Eighth Amendment rights.  *Miltier*, 896 F.2d at 851.

To prevail on an Eighth Amendment claim, the prisoner must demonstrate (1) his medical condition was a sufficiently serious one and (2) subjectively, the prison officials acted with a sufficiently culpable state of mind, which is satisfied by showing deliberate indifference by the prison officials.  *Goodman v. Wexford Health Sources, Inc.*, No. 09-

13

6996, 2011 WL 1594915, at *1 (4th Cir. Apr. 28, 2011) (quoting *Johnson v. Quinones*, 145

F.3d 164, 167 (4th Cir. 1998)).  As the United States Supreme Court has explained,

> Since, we said, only the "'unnecessary *and wanton* infliction of pain'" implicates the Eighth Amendment, a prisoner advancing such a claim must, at a minimum, allege "deliberate indifference" to his "serious" medical needs.  "It is *only* such indifference" that can violate the Eighth Amendment; allegations of "inadvertent failure to provide adequate medical care," or of a "negligent . . . diagnos[is]," simply fail to establish the requisite culpable state of mind.

*Wilson v. Seiter*, 501 U.S. 294, 297 (1991) (emphasis and alteration in original) (citations

omitted).  The culpable state of mind–deliberate indifference–requires knowledge of the

general risk and knowledge that the conduct at issue is inappropriate in light of that risk.

*Rich v. Bruce*, 129 F.3d 336, 340 n.2 (4th Cir. 1997). A prison official who knows of a

substantial risk may be protected from liability if he responded reasonably to the risk, even

if the potential harm from the risk was not avoided.  *Farmer*, 511 U.S. at 844.  Further, in

the context of prisoner medical care, the Constitution requires only that prisoners receive

adequate medical care; a prisoner is not guaranteed his choice of treatment.  *Jackson v.

Fair*, 846 F.2d 811, 817 (1st Cir. 1988) (citing *Layne v. Vinzant*, 657 F.2d 468, 471 (1st Cir.

1981)); *see Russell v. Sheffer*, 528 F.2d 318, 318 (4th Cir. 1975) (citing *Blanks v.

Cunningham*, 409 F.2d 220 (4th Cir.1969); *Hirons v. Director*, 351 F.2d 613 (4th Cir.1965))

("Prisoners are entitled to reasonable medical care."); *see also, e.g.*, *Barton v. Dorriety*, No.

9:10-cv-1362, 2011 WL 1049510, at *2 (D.S.C. Mar. 21, 2011) (citing *Jackson*, 846 F.2d

at 817).  The fact that a prisoner believed he had a more serious injury or that he required

better treatment does not establish a constitutional violation.  *See, e.g.*, *Russell*, 528 F.2d

at 319.

14

Here, Plaintiffs should survive summary judgment on the deliberate indifference claim as to Riopedre's medical needs.  As Defendants concede, suicide is the type of serious injury contemplated by the Eighth Amendment.  *See Brown v. Harris*, 240 F.3d 383, 389 (4th Cir. 2001).  Thus, the Court turns to whether Defendants acted with deliberate indifference.  Plaintiffs argue that Defendants were put on notice of Riopedre's suicidal tendencies because of Riopedre's significant weight loss, his recent use of Paxil and the known side effects of suicidal ideation when stopping the medication, his known history of depression, and his unhappiness at being placed in SHU.  [Doc. 92 at 17.] Mendez was concerned enough about her husband, based on conversations with him, to reach out to his lawyer and her Congressional representative to ask them to intervene on Riopedre's behalf. [*Id.*]  Defendants counter that Riopedre was screened for both medical and mental health issues upon his arrival at the prison, that he refused Paxil or other antidepressants when offered, and that he was seen by a staff psychologist every 14 days during his stay in SHU, who saw no signs of suicidal tendencies. [Doc. 88 at 17–21.]

The Court finds that there is a genuine issue of material fact as to whether Riopedre was exhibiting signs of depression such that prison staff knew of the risk of suicide and were deliberately indifferent to such a risk.  The reports of his mental state that Riopedre allegedly gave to mental health officials at Estill were significantly different from those he gave to his wife, to whom he told he was "destroyed."  A trier of fact could find that a weight loss of over thirty pounds in the span of just over a month would have been sufficient to give prison officials knowledge that Riopedre was at significant risk of suicide.  Prison officials were aware that Riopedre had been on Paxil and of the potential side effects of Paxil, which can be exacerbated in stressful situations, such as incarceration and then

15

being placed in the restrictive SHU.  Therefore, the Court finds there is a question of fact as to whether Defendants were deliberately indifferent to Riopedre's medical needs as to his suicide risk.

Further, the Court finds that there is a genuine issue of material fact as to whether prison officials acted in deliberate disregard of Riopedre's medical needs when the record contains evidence that it possibly took Defendants between 28 to 30 minutes to respond to Riopedre's hanging.  Evidence of record indicates that Defendants were notified of an emergency situation involving Riopedre at between 6:18 am and 6:20 am. [*See, e.g.*, Doc. 93-3 at 16-17, 42, 44; and Doc. 93-51 at 34-35.]  Defendants contend, however, that the call for staff assistance in SHU for a medical emergency went out at approximately 6:48 a.m. and that, in the rush of the situation response, certain Defendants incorrectly recorded that time at which the notification was made as being earlier than 6:48 a.m. [Doc. 88 at 36–38.]  The  issue of whether or not there was a prolonged delay in providing assistance to Riopedre is at the heart of the Plaintiffs' deliberate indifference claim and is in dispute here.  Plaintiffs have presented expert testimony to support their contention that Riopedre's life might have been saved had the response time been more rapid.  [Doc. 92-17 ¶ H, Doc. 92-16 ¶ 11.]  In a similar case, the Sixth Circuit Court of Appeals found that leaving an inmate hanging in his cell for over eight minutes, whom the prison officials believed to be deceased upon discovery, could constitute deliberate indifference.  *Heflin v. Stewart Cnty., Tenn.*, 958 F.2d 709, 716 (6th Cir. 1992).  The circuit court determined that discovery of the hanging body equated to a "pervasive risk of harm" to the decedent in that case, and the officers took "no reasonable steps to save his life."  *Id.*  "It is one thing to ignore someone who has a serious injury and is asking for help; it is quite another to be required

to screen prisoners correctly to find out if they needed help.'  [Plaintiff] had a 'serious injury,' and his condition cried out for help." *Id.* (quoting *Danese v. Asman*, 875 F.2d 1239, 1244 (6th Cir. 1989)).   Here, Riopedre's cell mate notified officers of the medical emergency and there is a factual dispute as to whether the officers took any reasonable steps to save Riopedre's life.   Moreover, the Court finds other questions of fact such as why the officer doing rounds the morning of Riopedre's suicide returned to take a second look and why, after the emergency call from Riopedre's cell mate, who himself had been on suicide watch, the officers could not see Riopedre and therefore had difficulty determining what was wrong.  [Doc. 92-19 at 6.]  Although not a comprehensive list, these and other factual disputes are best left to a jury.   Because this matter must await determination of the facts now in conflict, qualified immunity as set forth in *Harlow v. Fitzgerald*, 457 U.S. 800 (1982), and its progeny is inappropriate as well.   Therefore, the Court recommends that Defendants' motion for summary judgment be denied with respect to Plaintiffs' deliberate indifference claim.[12]

---

[12] To the extent that Plaintiffs argue Riopedre's Eighth Amendment rights were violated by his placement in the SHU, this claim should fail.  There is no constitutional right for a prisoner to be housed in a particular institution, at a certain custody level, or in a certain unit.  *McKune v. Lile*, 536 U.S. 24, 39 (2002) ("[i]t is well settled that the decision where to house inmates is at the core of prison administrators' expertise."). To the extent Plaintiffs argue that such custody exacerbated Riopedre's depression and that such depression should have been addressed, the Court finds that questions of material fact remain as to whether this constitutes a deliberate indifference to medical needs, which is addressed above.

Additionally, if Plaintiffs are attempting to argue that Defendants were deliberately indifferent to Riopedre by not following BOP's policies and procedures, this claim fails because such allegations are insufficient to articulate a constitutional violation.  *See Atkins v. Michell*, Case No. 3:09-CV-1046-RBH, 2010 WL 646852, at *12 (D.S.C. Feb. 19, 2010).  Therefore, the Court finds that the allegations that Riopedre was able to stockpile his socks as a violation of policy do not rise to a constitutional violation, but like the placement in SHU, to the extent such claims implicate his medical care and supervision, such claims are discussed above.

**FTCA Claim**[13]

Plaintiffs allege negligence under the FTCA. [Doc. 40 at 30–34.] Plaintiffs argue that Defendants owed a duty to Riopedre to keep him safe and alive, which was breached. [*Id.*] Additionally, Plaintiffs allege that the Government's failure to provide proper medical treatment to Riopedre breached the standard of care and was negligent. [*Id.* at 32.]

The FTCA provides a limited waiver of sovereign immunity that enables parties that are injured by an agent of the United States to obtain relief. The United States is the only

---

[13] The Court analyzes Plaintiffs' FTCA claim as a negligence claim rather than a medical malpractice claim. In South Carolina, a plaintiff alleging a medical malpractice claim must prove by a preponderance of the evidence:

> (a) The recognized and generally accepted standards, practices, and procedures in the community which would be exercised by competent physicians in the same speciality under similar circumstances;
>
> (b) that the physician or medical personnel negligently deviated from the generally accepted standards, practices, and procedures;
>
> (c) that such negligent deviation from the generally accepted standards, practices, and procedures was a proximate cause of the plaintiff's injury; and
>
> (d) that the plaintiff was injured.

*Dumont v. United States*, 80 F.Supp.2d 576, 581 (D.S.C. 2000) (internal citations omitted). A plaintiff must establish by expert testimony both the "standard of care and the defendant's failure to conform to the required standard, unless the subject matter is of common knowledge or experience so that no special learning is needed to evaluate the defendant's conduct." *Martasin v. Hilton Head Health Sys. L.P.*, 613 S.E.2d 795, 799 (S.C. Ct. App. 2005) (*citing Gooding v. St. Francis Xavier Hosp.*, 487 S.E.2d 596, 599 (S.C. 1997)). "In addition to proving the defendant negligent, the plaintiff must also prove that the defendant's negligence was a proximate cause of the plaintiff's injury." *Carver v. Med. Soc'y of S.C.*, 334 S.E.2d 125, 127 (S.C. Ct. App. 1985). Finally, in South Carolina, the burden of proof in a medical malpractice case is entirely upon the plaintiff. *Dumont*, 80 F. Supp. 2d at 581.

Plaintiffs failed to file the requisite expert affidavit with their Complaint to allege a medical malpractice claim. Under South Carolina Code § 15-36-100, Plaintiffs are required to file "as part of the complaint an affidavit of an expert witness which must specify at least one negligent act or omission claimed to exist and the factual basis for each claim . . . ." This requirement is substantive, not procedural, and failure to do so subjects the case to dismissal. *See Rotureau v. Chaplin*, Case No. 2:09-CV-1388-DCN, 2009 WL 5195968, at *6 (D.S.C. Dec. 21, 2009). The Court required Plaintiffs to further brief this issue, and Plaintiffs responded that their FTCA claim was not one for medical malpractice, but for failure to respond and failure to prevent contraband used in suicide. [Doc. 101.] Therefore, the Court proceeds to analyze the FTCA claim in these contexts, and an expert affidavit is not required. Plaintiffs specify that all other claims under the FTCA have been abandoned. [Doc. 101 at 1–2.]

18

proper defendant to a FTCA claim. *Holmes v. Eddy*, 341 F.2d 477 (4th Cir. 1965) (holding that federal agencies cannot be sued under the FTCA); *see also* 28 U.S.C. § 1346(b) (conferring jurisdiction on courts for tort claims "against the United States"). The FTCA has an administrative exhaustion requirement, pursuant to which a potential plaintiff must file an administrative tort claim. *See Plyler v. United States*, 900 F.2d 41, 42 (4th Cir. 1990). Defendant admits that Plaintiffs meet the exhaustion requirement in this case. [Doc. 20-1 at 2.]

Under the FTCA, federal courts are directed to determine liability based upon a consideration of relevant state law. Because the negligence allegedly occurred in South Carolina, the substantive law of South Carolina controls. *See United States v. Neustadt*, 366 U.S. 696, 706 n. 15 (1961). Accordingly, the claims relating to care provided should be evaluated in accordance with South Carolina tort law. To prove negligence in South Carolina, a plaintiff must show (1) that defendant owed plaintiff a duty; (2) such duty was breached; and (3) damage resulted from the breach of the duty. *Bloom v. Ravoira*, 529 S.E.2d 710, 712 (S.C. 2000). The duty owed under the FTCA is that of "reasonable care." *Pendergrass v. United States*, Case No. 11-CV-2706, 2013 WL 518842, at *2 (D.S.C. Feb. 12, 2013).

Plaintiffs' negligence claim centers on whether prison officials were negligent in failing to prevent Riopedre's suicide and that prison officials were negligent in responding to his suicide. In South Carolina, the duty to prevent suicide requires the exercise of reasonable care. *Barmlette v. Charter Medical Columbia*, 393 S.E.2d 914 (1990). The United States focuses its arguments on reasonable care, and not on causation or

damages.  The Court finds, however, that there is a genuine issue of material  fact as to whether Riopedre was a suicide risk, whether Defendants should have been on notice of Riopedre's deteriorating mental health, and whether prison officials should have done more to lower his risk of suicide.  Similar to the deliberate indifference analysis under the *Bivens* claim, a trier of fact could find that a weight loss of over thirty pounds in the span of just over a month could have been sufficient to put prison officials on notice that Riopedre was at significant risk for suicide.  While prison officials were aware that Riopedre had been on Paxil and of the potential side effects of Paxil, Defendants contend that Riopedre "did not display any of the symptoms associated with the adverse effects of abruptly discontinuing Paxil." [Doc. 88 at 22.]  A jury could find, however, that with such knowledge, and in light of the significant weight loss of Riopredre in a short period of time, the prison officials breached their duties by not closely observing Riopedre's for suicide prevention and by not removing him from the SHU per policy for an inmate determined to be at suicide risk. Likewise, as discussed in the *Bivens* analysis, prison officials arguably took between 28 and 30 minutes to respond to Riopedre's suicide.  A genuine issue of material fact as to whether this alleged conduct rises to the level of a deliberate indifference claim is certainly sufficient to raise a genuine issue of material fact as to whether Defendants acted negligently.   Therefore, the Court recommends that Defendants' motion for summary judgment be denied with respect to Plaintiffs' FTCA claim.

## CONCLUSION

Wherefore, based upon the foregoing, the Court recommends that Defendants' motion for summary judgment be GRANTED IN PART AND DENIED IN PART. The Court recommends that the motion be granted with respect to Plaintiffs' First, Fifth, and Fourteenth Amendment claims under *Bivens;* denied with respect to Plaintiffs' Eighth Amendment claim against Defendants in their individual capacities under *Bivens*; and denied with respect to Plaintiffs' FTCA claim.[14]

IT IS SO RECOMMENDED.

s/Jacquelyn D. Austin
United States Magistrate Judge

July 3, 2014
Greenville, South Carolina

---

[14]Defendants have not moved for summary judgment with respect to Mendez's loss of consortium claim.